IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 14-cv-01043-LTB

CHARLES E. ADKINS,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

_____

**ORDER**

_____

Plaintiff Charles E. Adkins appeals the final decision of Acting Commissioner of Social Security Carolyn W. Colvin ("SSA") denying his application for disability benefits under Title II of the Social Security Act, 42 U.S.C. § 401, *et seq.*, and for supplemental security income ("SSI") under Title XVI of the act, 42 U.S.C. § 1381, *et seq.* I have considered the briefs [Docs. # 15, 16, 17] and the administrative record [Doc. # 11] ("AR"). Oral argument would not materially assist me in determining this appeal.

Mr. Adkins argues that the administrative law judge ("ALJ") erred in determining his residual functional capacity at step four of SSA's sequential process for evaluating disability. Specifically, he contends that the ALJ failed to properly develop the opinions of a treating physician; improperly discounted the opinions of an examining physician; and failed to properly account for his mental impairments. He seeks an award of benefits or, alternatively, a new administrative hearing. As I explain below, these arguments are without merit. Accordingly, I **AFFIRM**.

## I. Background

**A. Procedural History**

On January 25, 2011, Mr. Adkins filed his claim for benefits with SSA, alleging that he became disabled on February 1, 2010. AR 11. SSA denied his claim initially on August 23, 2011. *Id.* Mr. Adkins requested a hearing, which took place on September 26, 2012, before an ALJ. *Id.* In a decision dated October 15, 2012, the ALJ concluded that Mr. Adkins was not disabled and denied his claim. AR 8. Mr. Adkins sought review by SSA's Appeals Council. AR 7. On February 25, 2014, thzxe Appeals Council denied review, making the ALJ's decision the final decision of SSA. AR 1; *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). On April 14, 2014, Mr. Adkins timely filed the instant appeal [Doc. # 1]. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**B. Medical Evidence**

The following facts are undisputed. In March 2010, Mr. Adkins presented to Richard King, M.D., at Pueblo Community Health Center. AR 255. He complained of wheezing, coughing, and drainage, but noted that he generally does not have trouble with his lungs. AR 254-55. Dr. King assessed chronic obstructive pulmonary disease ("COPD") and asthma. *Id.* He refilled an albuterol inhaler and noted that Mr. Adkins was also using a Flovent inhaler. *Id.*

In April 2010, Mr. Adkins told Dr. King that he had experienced a "partial seizure" a "couple of weeks ago." AR 254. Dr. King assessed "seizure disorder" but noted that it was "stable." AR 254. He refilled Mr. Adkins' Dilantin, a medication to control seizures. *Id.* He noted that Mr. Adkins' breathing was doing well and that he had no shortness of breath or chest pains. *Id.*

In October 2010, Mr. Adkins presented to an emergency room.  He believed he had just experienced a seizure because he woke up shaking, vomiting, and having diarrhea.  AR 219.  He reported that he once had a seizure due to a "meth OD" and that he "often neglect[ed] to take" his Dilantin.  *Id.*  The ER doctor assessed likely food poisoning rather than a seizure.  AR 222.

Mr. Adkins saw Dr. King again in December 2010.  AR 252.  Dr. King noted wheezing, assessed COPD, and refilled the inhalers.  *Id.*  He noted that Mr. Adkins had not had a seizure in "many months."  *Id.*  Mr. Adkins complained of "a lot of pain in his back and his hips."  *Id.*  Dr. King noted that Mr. Adkins moved slowly getting on and off of the examination table and was clearly uncomfortable due to back stiffness.  *Id.*  He assessed back pain.  *Id.*

In January 2011, Mr. Adkins again presented to the ER, where he claimed he had ingested excessive alcohol and Dilantin in order "to harm himself."  AR 203.  The ER doctor noted that Mr. Adkins smelled of alcohol but that his "Dilantin level was undetectable," which "cast[ed] doubt [on] his claim."  AR 206-07.  He was sent to a detoxification facility.  AR 207.

In February 2011, Mr. Adkins told Dr. King that he had experienced a seizure the week before and another a month before that.  AR 248.  He complained of "a lot" of pain in his back "with pain down both legs into the calf region."  *Id.*  Dr. King assessed acute and chronic back pain; prescribed the pain reliever tramadol and the muscle relaxant Robaxin; and ordered a magnetic resonance imaging scan ("MRI").  *Id.*  The MRI showed degenerative disc disease, most significantly at the L2-L3 level, with some foraminal encroachment.  AR 274.

In April 2011, Mr. Adkins told Dr. King that he could only walk two blocks before being "incapacitated" with back pain but could ride his bicycle "for [a] much longer period of time."  AR 281.  He had not tried the tramadol that Dr. King prescribed.  *Id.*  Dr. King told Mr. Adkins

3

that he had "basically a pain control issue," advised trying the tramadol along with ibuprofen, and said he would prescribe other pain relievers if that did not work. *Id.* He added that Mr. Adkins would be "limited on activities, in particular standing, walking, and bending." *Id.* He noted that Mr. Adkins' COPD was stable. *Id.*

In May 2011, non-examining physician James McElhinney, M.D., reviewed the file in connection with the instant disability claim. AR 66-67. He opined that Mr. Adkins could lift 25 pounds occasionally and 20 pounds frequently and could "stand and/or walk" 4 hours and sit 6 hours in an 8-hour workday. AR 66. He also opined that Mr. Adkins could stoop (*i.e.,* bend at the waist) and crouch (*i.e.,* bend at the knees) without limitation. *Id.* He recommended that Mr. Adkins avoid "even moderate exposure" to fumes, odors, dusts, gases, poor ventilation, and unprotected heights due to his history of COPD and seizures. AR 67.

In June 2011, Mr. Adkins submitted to a physical examination with Jeremy Drechsler, D.O. AR 289-94. Mr. Adkins said his back pain began four years ago, when he tried to lift some bleachers by himself. AR 289. He said the pain was in his lower back and radiated down his legs. *Id.* He claimed he could only walk 50 feet at a time, but noted that riding his bike did not aggravate his pain as much. *Id.* He said that "[i]t is hard for him to clean or cook or do anything" and that his sister and mother bring over food and "help him in his home, since he can only basically walk with the help of holding onto countertops." AR 290. While Dr. Drechsler noted that the "pain medicines [Mr. Adkins] is on" did not help, no pain medications are noted in the "current medications" section of his report. *Id.* On examination, he observed that Mr. Adkins "had pain-mitigating movements throughout" and provided details in this regard. *See* AR 291. He assessed back pain and asthma. AR 294. He assigned functional limitations of 0 to

2 hours of standing, 0 to 2 hours of walking, and 2 to 4 hours of sitting, all in an 8-hour workday allowing for breaks every 10 to 15 minutes. *Id.* He also imposed a lifting limitation of 10 pounds for 0 to 2 hours and a carrying limitation of 10 to 15 pounds for 0 to 2 hours. *Id.*

In August 2011, psychologist Richard Madsen, Ph.D., examined Mr. Adkins. AR 298-302. Mr. Adkins reported that he "gets very depressed." AR 298. He said he was sleeping only three to four hours per night and felt chronically tired. *Id.* He reported suicidal thoughts, although Dr. Madsen questioned his claim of a Dilantin overdose in January 2011. AR 299-300. Dr. Madsen noted that Mr. Adkins was "extremely talkative" and had friends. AR 299, 301. He assessed moderate to severe chronic depression, but noted that Mr. Adkins "has chronic alcohol abuse" and uses marijuana. AR 302. Dr. Madsen opined that Mr. Adkins' "ability to do work-related activities will be impaired by" his depression and assigned him a "Global Assessment of Functioning" score of 60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*; Amer. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders at 32 (4th ed. 1994) ("DSM-IV").

Also in August 2011, and shortly after Dr. Madsen's examination, non-examining psychologist MaryAnn Wharry, Psy.D., reviewed the file. AR 63-64, 67-69. She concluded that Mr. Adkins' psychiatric issues, which she classified as an affective disorder and a substance addiction disorder, mildly restricted his activities of daily living, moderately restricted his ability to maintain social functioning, and moderately restricted his ability to maintain concentration, persistence, or pace, but had caused no episodes of decompensation of extended duration. AR 64. She completed a mental residual functional capacity assessment in which she provided more detailed opinions regarding Mr. Adkins' limitations in these areas. AR 67-69.

5

In September 2011, Mr. Adkins complained to Dr. King that he had been "very depressed" for three to four months and was hardly able to get out of bed. AR 336. He said he was not sleeping well and had been irritable and angry. *Id.* He said he had a job two weeks ago "for 3 days and [it] ended when he had a seizure." *Id.* Dr. King prescribed Depakote to treat the seizures and "as [a] mood stabilizer." *Id.* He also prescribed Celexa, an antidepressant. *Id.*

In November 2011, Mr. Adkins told Dr. King that he had not had a seizure since beginning Depakote. AR 335. He reported that he "feels much better but still has episodes of depression" and "some anxiety." *Id.* He complained of back pain but said he did "not want to take any medications at this time." *Id.* The same month, Dr. King wrote a letter stating that Mr. Adkins' "back disease" would limit "activities such as lifting and bending" and that his "bipolar disease" would "limit him in interactions with others." AR 334.

In December 2011, Mr. Adkins saw Nicholas Rodriguez, LCSW, a clinical social worker at Pueblo Community Health Center. AR 328-29. Mr. Adkins reported trouble sleeping, concentrating, and remembering, as well as fatigue, thoughts of suicide, and decreased self-esteem. AR 329. Mr. Rodriguez assessed severe major depressive disorder without psychotic features. AR 328. He assigned a GAF score of 55, which, like the score of 60 assigned by Dr. Madsen, indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*; DSM-IV at 32.

Mr. Adkins saw Mr. Rodriguez again in January and March of 2012, and continued to report issues with sleep, fatigue, and memory. AR 326-27. In May 2012, Mr. Rodriguez completed a mental residual functional capacity questionnaire in which he indicated that Mr. Adkins had marked or extreme limitations in all areas of mental functioning. AR 337-39. He

noted that Mr. Adkins was not able to work a 40-hour workweek and would be off task 80

percent of the time.  AR 339.

Mr. Adkins also continued to see Dr. King in 2012.  In January, Dr. King noted that Mr.

Adkins "clearly is disabled and unable to work in a competitive environment at all between the

memory issues, back trouble, [and] shoulder pain."  AR 332-33.  He added that "I do not think

he can walk more than 2-3 blocks at a time due to his back and certainly there are the issues with

his seizures as well."  *Id.*  At a February visit, Dr. King noted that Mr. Adkins was "doing well"

on Depakote and Dilantin and "had not had any seizures for about nine months."  AR 331.  At a

March visit, Mr. Adkins said he had been "breathing better" but still had some trouble breathing.

AR 330.  He acknowledged that he was not using his Flovent every day.  *Id.*  He reported having

mood swings and being depressed "from time to time."  *Id.*  Dr. King raised his dose of

Depakote to "smooth his moods out a bit."  *Id.*

**C.  Function Report and Personal Pain Questionnaire**

In a function report that he submitted in February 2011, Mr. Adkins stated that his daily

activities included "do[ing] morning chores, [taking a] bath, and hang[ing] out at home most of

[the] day."  AR 173.  "If [the] weather is good[,] I go out for a while or do errands," he added.

*Id.*  He noted he had "no problem" with any "personal care" activities.  AR 173-74.  He reported

preparing his own meals.  He reported taking care of housework—including doing his laundry at

a laundromat each week and straightening up his apartment each day—without the help of

others.  AR 174.  He noted that he shopped for groceries, household items, and clothing on his

own.  AR 175.  He said he was able to handle his own money.  *Id.*  He noted that his hobbies

included "woodworking (decoupage), watching TV, [and] listen[ing] to music," although he said

he has had to "do small[er] items and projects" since his conditions began.  AR 176.

Mr. Adkins also reported spending time with others, including going to see his parents, children, and grandchildren, or having them over at his apartment.  *Id.*  He reported going to their homes and to the park "on a regular basis."  *Id.*  He indicated he had no problem getting along with family, friends, neighbors, or others, and said he gets along with authority figures "very well."  AR 177-78.  He said that he was able to pay attention for "quite a while," follow spoken instructions "well," and handle changes in routine "well."  *Id.*

On a personal pain questionnaire that Mr. Adkins submitted in September 2011, he reported that "periodically throughout the entire day" he experienced pain in his lower back that radiated down both legs.  AR 171.  He reported that "pain medication" and a heating pad "sometimes" provided pain relief.  *Id.*  He noted that his pain precluded him from walking "long distances" and sitting for "long periods at a time."  *Id.*  He was asked to list "your pain medication(s)" but listed none.  *Id.*  He reported, however, taking Dilantin for seizures, Robaxin for spasms, and Pamelor for depression, and noted that these medications were effective.  *Id.*

**D.  Hearing Testimony**

At the hearing in September 2012, Mr. Adkins testified that he has pain "every day" in his lower back, and that it wakes him out of a dead sleep three to four times a week.  AR 35.  Mr. Adkins testified that he is able to lift 10 pounds.  AR 37.  He said he is able to sit or stand for 10 to 15 minutes before needing to change positions.  AR 38.  He said he has to lie down three to four times per day for one to two hours at a time.  AR 39-40.  In regard to activities, Mr. Adkins testified that he "take[s] care of all [his] personal needs such as grocery shopping, cooking, meal preparation, cleaning, [and] laundry."  AR 27.  He noted that he doesn't do certain cleaning

chores "as well as I used to" due to back pain.  AR 37.  He testified that he picks up cans to earn

money for marijuana.  AR 46.  He gets around by walking, riding his bicycle, or getting rides

from his parents.  AR 44.  In regard to his mental health, Mr. Adkins testified that he is "more

content being by myself" and that he is "not very people oriented."  AR 41.  In contrast with

what he wrote in his function report, he testified that "[i]t's hard for me to work with people."

*Id.*  He noted that his mental health condition affects his memory, his interactions with others,

and his social life, and makes it difficult to stay focused on tasks.  AR 42.

## II.  Legal Standards

### A.  SSA's Five-Step Process for Determining Whether a Claimant Is "Disabled"

A claimant is "disabled" under Title II and Title XVI of the Social Security Act if he is

unable to "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  SSA has

established the following five-step sequential evaluation process for determining whether a

claimant is disabled and thus entitled to benefits.  The process applies to Title II and Title XVI

claims alike.  *See* 20 C.F.R. §§ 404.1520, 416.920.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful

activity."  *Id.* §§ 404.1520(b), 416.920(b).  If he is, benefits are denied and the inquiry stops.  *Id.*

At step two, SSA asks whether the claimant has a "severe impairment," or one that "significantly

limits [his] physical or mental ability to do basic work activities."  *Id.* §§ 404.1520(c),

416.920(c).  If he does not, benefits are denied and the inquiry stops.  *Id.*  If he does, SSA moves

on to step three, where it determines whether the claimant's impairment(s) "meet or equal" one

of the "listed impairments"—impairments so severe that SSA has determined that a claimant

who has them is conclusively disabled without regard to the claimant's age, education, or work

experience. *Id.* §§ 404.1520(d), 416.920(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC"), *i.e.,*

what he is still able to do despite his impairments, and asks whether the claimant can do any of

his "past relevant work" given that RFC. *Id.* §§ 404.1520(e), 416.920(e). If not, SSA goes to

the

fifth and final step, where SSA has the burden of showing that the claimant's RFC allows him to

do other work in the national economy in view of his age, education, and work experience. *Id.*

§§ 404.1520(g), 416.920(g). At this step, SSA's "grid rules" may mandate a finding of disabled

or not disabled without further analysis based on the claimant's age, education, and work

experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2; 20 C.F.R. § 416.969. In contrast with step five,

the claimant has "the burden of establishing a prima facie case of disability at steps one through

four." *Doyal,* 331 F.3d at 760.

## B. Standard for Reviewing SSA's Decision

My review is limited to determining whether SSA applied the correct legal standards and

whether its decision is supported by substantial evidence in the record. *Williamson v. Barnhart,*

350 F.3d 1097, 1098 (10th Cir. 2003); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir. 2001);

*Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir. 2000). With regard to the law, reversal may be

appropriate when SSA either applies an incorrect legal standard or fails to demonstrate reliance

on the correct legal standards. *See Winfrey v. Chater,* 92 F.3d 1017, 1019 (10th Cir. 1996).

With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom.  If they are so supported, they are conclusive upon [this] court and may not be disturbed."  *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion."  *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The record must demonstrate that the ALJ considered all of the evidence, but the ALJ is not required to discuss every piece of evidence.  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  I may not re-weigh the evidence or substitute my judgment for that of the ALJ.  *See Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 800 (10th Cir. 1991); *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).

### III.  The ALJ's Decision

The ALJ followed the five-step analysis outlined above.  At step one, the ALJ found that Mr. Adkins had not engaged in substantial gainful activity since the alleged onset date of his conditions, February 1, 2010.  AR 13.  At step two, the ALJ found the following severe impairments: COPD, asthma, degenerative disc disease, epilepsy, and affective disorder.  AR 14.  At step three, the ALJ concluded that Mr. Adkins did not meet or equal any listed impairment.  AR 14-15.  At step four, the ALJ determined that Mr. Adkins' RFC allowed him "to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that [he] could stand and walk up to four hours of an eight hour workday [and] sit for six hours of an eight hour workday."  AR 15.  The ALJ further limited Mr. Adkins to no climbing of ladders, ropes, and

scaffolds; occasional climbing of stairs and ramps; occasional balancing, kneeling, stooping, crouching, and crawling; no concentrated exposure to extreme cold and vibration; no exposure to even moderate dust, fumes, odors, and gases; and no exposure to unprotected heights and major manufacturing machinery. *Id.* The ALJ also limited Mr. Adkins to unskilled work. *Id.* The ALJ determined that Mr. Adkins' RFC did not allow him to perform any past relevant work. AR 21. At step five, the ALJ concluded that Mr. Adkins' RFC allowed him to perform jobs that exist in significant numbers in the national economy, specifically the jobs of "cashier II," "ticket seller," and "furniture rental consultant." AR 22. The ALJ therefore determined that Mr. Adkins was not disabled. AR 23.

## IV.  Analysis

### A.  The ALJ's Development of the Record With Respect to Dr. King's Opinions

At an April 2011 office visit, Dr. King wrote that, due to Mr. Adkins' back pain, he "would be limited on activities, in particular standing, walking, and bending." AR 281. In a November 2011 letter, Dr. King wrote that, "[w]ith his back disease, [Mr. Adkins] would have limitations on activities such as lifting and bending." AR 334. The ALJ "accord[ed] significant weight" to Dr. King's opinions "limiting [Mr. Adkins'] standing, walking, bending and lifting," but noted that "the suggested limitations are not quantified." AR 18. Mr. Adkins argues that the ALJ erred by not "attempt[ing] to recontact Dr. King, plaintiff's treating physician, so that he could quantify his opined limitations." Opening Br. at 14 [Doc. # 15].

An ALJ must "fully and fairly develop[] the record as to material issues," but "does not have to exhaust every possible line of inquiry." *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (internal quotations and citation omitted). "The standard is one of reasonable good

judgment." *Id.*  SSA's regulations provide that "the evidence in [a claimant's] case record is insufficient" where "it does not contain all the information we need to make our determination or decision."  20 C.F.R. §§ 404.1520b(c), 416.920b(c).  In that circumstance, the ALJ has several options, including recontacting medical sources for additional evidence, requesting more information from the claimant, or directing the claimant to undergo a consultative examination. *Id.*

There was sufficient evidence in the record for the ALJ to determine Mr. Adkins' abilities to stand, walk, lift, and bend, despite the fact that Dr. King's opinions on these issues were not quantified.  With regard to standing and walking, Dr. McElhinney, a non-examining physician, opined that Mr. Adkins could stand and walk for up to four hours in an eight-hour workday.  AR 66.  The ALJ adopted this limitation.  AR 21.  With regard to lifting, Dr. McElhinney opined that Mr. Adkins could lift 25 pounds occasionally and 20 pounds frequently. AR 66.  The ALJ adopted a more restrictive limitation, noting that lifting those amounts "could exacerbate [Mr. Adkins'] pain and lumbar spine disorder."  AR 21; *see also* AR 15 (limiting Mr. Adkins to "light work," which, pursuant to 20 C.F.R. §§ 404.1567(b), 416.967(b), allows "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").  In the area of bending, Dr. McElhinney opined that Mr. Adkins could engage in frequent stooping and unlimited kneeling and crouching.  AR 66.  The ALJ again adopted more restrictive limitations, allowing only occasional kneeling, stooping, and crouching due to Mr. Adkins' "back pain and Dr. King[']s recommended limitations on postural activity."  AR 21. The ALJ noted that the "claimant's own reports of his activity level" supported his RFC assessment generally.  *Id.*

Mr. Adkins appears to view Dr. King's opinions in isolation, arguing that because they were not specific enough by themselves to allow for a determination of Mr. Adkins' limitations, a duty to recontact Dr. King arose.  As the regulations cited above make clear, however, the ALJ does not have a duty to develop the record unless "the evidence as a whole is inadequate to determine the issue of disability."  *Hawley v. Colvin*, No. 5:12-CV-260-FL, 2013 WL 6184954, at *6 (E.D.N.C. Nov. 25, 2013).  As discussed, the record contained much more than Dr. King's opinions.  Between Dr. King's opinions, Dr. McElhinney's opinions, and Mr. Adkins' reported pain and activities, the ALJ had substantial evidence from which he could, and did, determine Mr. Adkins' specific restrictions on standing, walking, lifting, and bending.  Therefore, there was no duty to recontact Dr. King.

Mr. Adkins objects to "the ALJ[']s [use of] Dr. McElhinney's opinion to fill in where Dr. King's opinion was not quantified, rather than recontacting Dr. King."  Opening Br. at 14 [Doc. # 15].  Mr. Adkins cites no authority for the idea that an ALJ cannot analyze the opinions of a treating physician and a non-examining physician in tandem to determine a claimant's RFC. Indeed, "[t]he ALJ, not a physician, is charged with determining a claimant's RFC from the medical record" and there is no requirement of "a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (internal quotations and citation omitted).  As noted above, an ALJ may address an insufficient record not only by recontacting a treating source but also by ordering a consultative examination, underscoring that consultative medical opinions may supplement or clarify treating opinions.  *See* 20 C.F.R. §§ 404.1520b(c), 416.920b(c).

Finally, I note that the claimant bears the burden of establishing a prima facie case of

disability at step four, and that he was represented by counsel at the administrative hearing. *Doyal,* 331 F.3d at 760; *Cowan v. Astrue,* 552 F.3d 1182, 1188 (10th Cir. 2008) ("[W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored.") (internal quotations and citation omitted).  Dr. King expressed the opinions in question in April and November of 2011, well before the September 2012 hearing.  To the extent Mr. Adkins believed SSA needed to recontact Dr. King, it would have been more appropriate to address that issue before or during the hearing.

## B.  The ALJ's Discounting of Dr. Drechsler's Opinions

Mr. Adkins argues that the ALJ erred in giving "very little weight" to Dr. Drechsler's "suggested limitations on standing, walking, sitting, lifting [and] carrying."  AR 19.  Dr. Drechsler opined that Mr. Adkins could stand for 0 to 2 hours, walk for 0 to 2 hours, and sit for 2 to 4 hours, all in an 8-hour workday providing for breaks every 10 to 15 minutes.  AR 294.  He opined that Mr. Adkins could lift 10 pounds for 0 to 2 hours and could carry 10 to 15 pounds for 0 to 2 hours.  *Id.*  In essentially rejecting these opinions, the ALJ relied on the fact that Dr. Drechsler only saw Mr. Adkins once; on an internal inconsistency in Dr. Drechsler's report; and on inconsistencies between Dr. Drechsler's report and Mr. Adkins' activities.  Mr. Adkins argues that these factors did not provide an adequate basis for rejecting Dr. Drechsler's opinions.

Mr. Adkins correctly notes that, standing alone, the fact that an examining physician has examined the claimant only once is not a sufficient basis for rejecting the examiner's opinion. *See Chapo*, 682 F.3d at 1291 (noting that "otherwise the opinions of consultative examiners would essentially be worthless").  Further, while the ALJ was entitled to consider internal

inconsistencies in Dr. Drechsler's report, I agree with Mr. Adkins that the cited inconsistency is insignificant. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (SSA considers extent to which a source "provide[s] supporting explanations for [his] opinions").  The ALJ noted that, while Dr. Drechsler "observed that it was very hard for [Mr. Adkins] to get on and off the exam table," he "also wrote that [Mr. Adkins] had no difficulty maneuvering in the exam room."  AR 19.  But Dr. Drechsler also observed that Mr. Adkins "was leaning on his left side the entire time"; "was very slow to get in the supine position and very slow to stand"; and "had to adjust his weight several times to get in a position that was comfortable while standing."  AR 291.  His isolated statement that Mr. Adkins had no difficulty maneuvering in the exam room is less significant in light of these comments.  Further, that statement was included in a section of Dr. Drechsler's report discussing Mr. Adkins' vision and was immediately followed by a statement that Mr. Adkins "responded appropriately to visual cues."  *Id.*  Thus, Dr. Drechsler was likely observing that Mr. Adkins' vision did not impair his ability to move about the room.

The fact that Dr. Drechsler's opinions were inconsistent with Mr. Adkins' activities, however, is significant.  The regulations provide that "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."  20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).  While Mr. Adkins told Dr. Drechsler that he is able to dress, bathe, cook, and clean, he also told Dr. Drechsler that it was "hard for him to clean or cook or do anything"; that "he can only basically walk with the help of holding onto countertops"; that "[h]e is not really able to go to stores much because he cannot walk more than 50 feet at a time"; and that "[h]e will go to [stores] and get groceries once in a while, but it is very difficult."  AR 290.  In February 2011, less than four months before Dr. Drechsler's examination, Mr. Adkins painted a

different picture in his function report.  Rather than note that it was hard for him to cook, he

noted that he spent 30 minutes each day preparing his own meals and that he has had no

"changes in cooking habits since [his conditions] began."  AR 174.  Instead of noting that it was

hard for him to clean, he wrote that he "straightens [his apartment] daily and do[es] laundry once

a week" at the laundromat, and that he needs no help doing these things.  *Id.*  And he indicated

that he could walk "[a] few blocks," *i.e.,* several hundred feet, rather than merely 50 feet, before

needing to rest.  AR 177.  He also noted that he went outside daily and that he got around by

walking or riding his bicycle.  AR 175.  At the hearing, Mr. Adkins reported earning cash for

marijuana by picking up cans, which presumably involves substantial walking and other

movements.  AR 46.

These inconsistencies, together with the fact that Dr. Drechsler had only seen Mr. Adkins

once, provided the ALJ with a substantial basis to reject his opinions.  I disagree with Mr.

Adkins that the ALJ impermissibly substituted his medical judgment for that of a physician.  *See*

*Winfrey*, 92 F.3d at 1022.  Rather, the ALJ properly discounted Dr. Drechsler's opinions because

they conflicted with other parts of the record.  *See Newbold v. Colvin*, 718 F.3d 1257, 1266 (10th

Cir. 2013) (affirming ALJ's decision to discount treating physician's opinion where the "extreme

limitations" the doctor imposed "were inconsistent with [the claimant's] reported activities of

daily living").  The ALJ referred to opinions provided by treating physician Dr. King and non-

examining physician Dr. McElhinney, together with Mr. Adkins' reported pain and activities, to

determine Mr. Adkins' limitations in the areas covered by Dr. Drechsler's rejected opinions.  *See*

*supra* Sec. IV.A; AR 19-21.  Accordingly, the ALJ did not substitute his medical judgment for

Dr. Drechsler's; he based his conclusions on other competent evidence in the record and gave

good reasons for doing so.

## C. The ALJ's Assessment of Mr. Adkins' Mental RFC

At step two, the ALJ determined that one of Mr. Adkins' severe impairments was affective disorder. AR 14. At step three, he concluded that Mr. Adkins' affective disorder was not so severe as to meet the listing for affective disorders and conclusively establish that Mr. Adkins was disabled. AR 14-15. In reaching this conclusion, the ALJ found that Mr. Adkins was mildly restricted in activities of daily living, was mildly restricted in social functioning, was moderately restricted in concentration, persistence, or pace, and had experienced no episodes of decompensation of extended duration. AR 14. At step four, the ALJ noted that "[d]ue to the claimant's moderate limitations in concentration, persistence and pace . . . he could perform work at the unskilled level." AR 21. The ALJ did not impose other limitations stemming from Mr. Adkins' mental impairments. Mr. Adkins argues that the ALJ erred in determining his mental RFC in three respects, which I address in turn.

First, Mr. Adkins argues that the ALJ erred by giving "very little weight" to the opinions of Mr. Rodriguez, the licensed clinical social worker who treated him, while giving more weight to the opinions of the non-examining psychologist, Dr. Wharry. AR 20. As the ALJ noted, and as Mr. Adkins does not dispute, Mr. Rodriguez is not considered an "acceptable medical source" because he is a licensed clinical social worker and not, for example, a psychologist like Dr. Wharry. *See* SSR 06-03P, 2006 WL 2329939, at *2 (Aug. 9, 2006). Because SSA does not deem licensed clinical social workers among "the most qualified health care professionals," they are not considered treating providers and their opinions are not entitled to controlling weight. *Id.* at *2, 5. Indeed, their opinions "cannot establish the existence of a medically determinable

impairment" but, rather, may "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* In considering such an opinion, the ALJ "generally should explain the weight given" the opinion "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

Here, the main document of note is a mental RFC form completed by Mr. Rodriguez, in which he indicated that Mr. Adkins had marked or extreme limitations in all areas of mental functioning, and that these limitations precluded full-time work. AR 337-39. The ALJ noted that these opinions appeared "grossly exaggerated" because someone with such limitations "would likely not be able to function outside of their home," yet Mr. Adkins "routinely went to appointments, socialized with family, interacted with doctors, service providers, grocery store clerks and friends," and "was able to perform all activities of daily living." AR 20. The record amply supports these observations.

For example, in his function report, Mr. Adkins reported that he had no problems "getting along with family, friends, neighbors, or others," and that he socialized with family members a "couple times a week." AR 176-77. Mr. Rodriguez's conclusion that Mr. Adkins has extreme limitations in his "ability to maintain socially appropriate behavior," for example, is inconsistent with these facts. AR 339. And Mr. Rodriguez's observation that Mr. Adkins is extremely limited in his ability to "adhere to basic standards of neatness and cleanliness" is inconsistent with his own repeated observations during office visits that Mr. Adkins is "neat and clean," including the week before he completed the mental RFC form. AR 326, 327, 339, 359,

361.  Further, Mr. Rodriguez assigned Mr. Adkins a GAF score of 55, indicating only moderate

symptoms or moderate difficulty in social, occupational, or school functioning.  AR 328.

Accordingly, the ALJ properly rejected Mr. Rodriguez's opinions, particularly in view of the fact

that Mr. Rodriguez is not an acceptable medical source.

Second, Mr. Adkins argues that the ALJ failed to include restrictions in Mr. Adkins' RFC

accounting for the mild limitations in activities of daily living and mild limitations in social

functioning that he found at step three.  But the Tenth Circuit has held that an ALJ's finding of

even a moderate limitation at step three "does not necessarily translate to a work-related

functional limitation for the purposes of the RFC assessment."  *Bales v. Colvin*, 576 F. App'x

792, 797-98 (10th Cir. 2014).  The court explained that because the step three analysis focuses

on "broad categories," whereas the RFC assessment at step four focuses on "more discrete and

focused functional abilities," the ALJ's step four findings need not "mirror the step-three

findings."  *Id.* at 798 & n.3.

Mr. Adkins relies on cases that found error in the ALJ's "failure to address" step three

limitations at step four.  *See, e.g., Crowder v. Colvin*, 561 F. App'x 740, 745 (10th Cir. 2014).

Here, however, the ALJ explained at step four that the "claimant routinely went to appointments,

socialized with family, interacted with doctors, service providers, grocery store clerks and

friends" and that he "was able to perform all activities of daily living."  AR 20.  In the next

sentence, the ALJ noted that "[h]is only moderate limitations in concentration, persistence and

pace are provided for in the residual functional capacity limiting him to unskilled work."  *Id.*

Thus, the ALJ considered his step three findings regarding mental limitations and explained why

he was importing only one of his three findings—of moderate limitation in concentration,

persistence, or pace, but not of mild limitation in activities of daily living or of mild limitation in social functioning—into Mr. Adkins' RFC. So this is not a situation where the ALJ failed to address step three findings at step four. *Cf. Apodaca v. Colvin*, No. 12-CV-02508-REB, 2014 WL 1309023, at *2 (D. Colo. Apr. 1, 2014) (noting that the "ALJ's step 4 assessment may [not] be totally divorced—*without explanation*—from his prior determination of the nature and severity of the claimant's impairments") (emphasis added).

Finally, Mr. Adkins argues that the ALJ erred by accounting for his moderate limitation in concentration, persistence, or pace by limiting him to unskilled work. The Tenth Circuit has explained that "intact mental aptitudes are not skills but, rather, general prerequisites for most work at any skill level" and has therefore rejected the notion that "a cognitive or emotional impairment may be functionally equated with the lack of a skill." *Wayland v. Chater*, Nos. 95-7029 and 95-7059, 1996 WL 50459 (10th Cir. Feb. 7, 1996); *see also Chapo*, 682 F.3d at 1290. As the Tenth Circuit recently noted, however, a reference to "unskilled work" may be construed to incorporate the mental functions associated with unskilled work, which are "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Jaramillo v. Colvin*, 576 F. App'x 870, 875 (10th Cir. 2014) (quoting SSR 85-15, 1985 WL 56857, at *4 (Jan. 1, 1985)).

Here, the ALJ relied in large part on the opinions of Dr. Wharry, the non-examining psychologist, in determining Mr. Adkins' mental RFC. AR 21. Dr. Wharry assessed the "focused functional abilities," *Bales*, 576 F. App'x at 798, associated with Mr. Adkins' "concentration and persistence limitations." AR 82. The only abilities in this category that she

found limited were the "ability to carry out detailed instructions"; the "ability to maintain attention and concentration for extended periods"; and the "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *Id.* She assigned moderate limitations in these areas. *Id.*  Restricting Mr. Adkins to unskilled work—with its associated restrictions to "simple" instructions, "usual" work situations, and "changes in a routine work setting"—was a reasonable way for the ALJ to address these limitations.

Mr. Adkins notes that the Tenth Circuit has found the mental restrictions associated with unskilled work inadequate to address moderate limitations in a claimant's "(1) ability to carry out instructions, (2) attend and concentrate, and (3) work without supervision." *Jaramillo*, 576 F. App'x at 872, 876.  But Dr. Wharry found no limitation in Mr. Adkins' ability to work without supervision.  And the moderate limitations she found were in Mr. Adkins' abilities to carry out *detailed* instructions and maintain attention and concentration for *extended periods* of time.  Dr. Wharry did not opine that he was limited in his ability to carry out instructions or maintain attention and concentration altogether, as in *Jaramillo*.  576 F. App'x at 872.  The ALJ did not err in concluding that Mr. Adkins' considerably narrower limitations were accommodated by the mental restrictions associated with unskilled work.

## V.  Conclusion

For the foregoing reasons, SSA's decision is **AFFIRMED**.

DATED: July __16__, 2015, at Denver, Colorado.

BY THE COURT:


____s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE